❑ Original ❑ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of )<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)* )<br>Information about the location of the cellular )<br>device assigned call number 773-708-4858, as )<br>further described in Attachment A )  | Case No. 25-802M(NJ)<br>Matter No. 2023R00109 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 2/17/2025 _____ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Nancy Joseph _____ .
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued: 2/3/2025 @ 1:52 p.m. _____

_____
*Judge's signature*

City and state:   Milwaukee, WI _____      Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**
**Matter Number 2023R109**

1. This warrant authorizes the use of the electronic investigative technique described in Attachment B to identify the location of the cellular device assigned phone number **773-708-4858**, **IMEI 351050542635590**, (referred to herein and in Attachment B as "**Target Cell Phone**"), whose wireless provider is AT&T ("Service Provider"), a wireless telephone service provider 11760 US Highway 1, Ste. 600 North Palm Beach, FL 33408.

2. Target Cell Phone.

**ATTACHMENT B**
**Particular Things to be Seized**
**Matter Number 2023R109**

I.      **Information to be Disclosed by the Service Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

     a.    The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period from November 1, 2024 to present:

         i.    Names (including subscriber names, usernames, and screen names);

        ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

      iii.    Local and long-distance telephone connection records;

      iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.    Length of service (including start date) and types of service utilized;

      vi.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

2

Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

3

ii.   Source and destination telephone numbers;

iii.   Date, time, and duration of communication; and

iv.   All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

c.   Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i.   To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or

4

with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

**II.** This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**III.    Information to be Seized by the Government**

All information described above in Section I that constitutes evidence and instrumentalities of possible crimes of possession of distribution and possession with intent to distribute controlled substances,  conspiracy to distribute and possess with the intent to distribute controlled substances, and use of a communications facility to facilitate a drug-trafficking offense, violations of Title 21 United States Code Sections 841(a)(1), 846, and 843(b), have been committed by Duane WILLIAMS (DOB:XX/XX/1998), Anton MATTHEWS (DOB:XX/XX/1996), Lorenzo GOODEN (DOB: XX/XX/1987), Rico L SMITH (XX/XX/1990), Steven P LLOYD (XX/XX/1983) and other known and unknown individuals during the period of January 1, 2023 to present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.

5

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information about the location of the cellular device<br>assigned call number 773-708-4858, as further<br>described in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 25-802M(NJ)<br><br>Matter No. 2023R00109 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

   ☑ evidence of a crime;

   ☐ contraband, fruits of crime, or other items illegally possessed;

   ☐ property designed for use, intended for use, or used in committing a crime;

   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 846;<br>and 843(b) | Possession with the intent to distribute controlled substances; Conspiracy to<br>possess with the intent to distribute controlled substances; Illegal use of a<br>communication facility to facilitate a drug-trafficking offense. |

The application is based on these facts:

**See Attached Affidavit.**

   ☑ Continued on the attached sheet.

   ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Mitchell G. Ward, DCI SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: 2/3/2025

*Judge's signature*

City and state:   Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**Matter Number 2023R109**

I, Mitchell G Ward, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, which is described in Attachment B, to determine the location of the cellular device assigned call number **773-708-4858,** (the "**Target Cell Phone**"), whose service provider is AT&T ("Service Provider"), a wireless telephone service provider headquartered at 11760 US Highway 1, Ste. 600 North Palm Beach, FL 33408.  The **Target Cell Phone** is described herein and in Attachment A.

2.      I am a state certified law enforcement officer employed as a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation, (DCI) and have been a sworn officer in the State of Wisconsin for over 32 years.  I am currently assigned to DCI's Milwaukee Field Office, Narcotics Bureau.  I am also a federally deputized task force officer for the United States Postal Inspection Service ("USPIS").  As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3.      I have participated in complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections

1956 and 1957, and other related offenses.  More specifically, my training and experience includes the following:

a.   I have utilized informants to investigate drug trafficking.  Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b.   I have experience conducting street surveillance of individuals engaged in drug trafficking.  I have participated in the execution of search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

c.   I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine.  I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale.  I know the street values of different quantities of the various controlled substances;

d.   I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations.  I am familiar with the language utilized over the telephone or other communication applications to discuss drug trafficking, and know that the language is often limited, guarded, and coded. Additionally, I know that drug traffickers often change their phone numbers and cellular devices on frequent basis in an attempt to thwart law enforcement from tracking their phones and to conceal their identity.

e.   I know that drug traffickers commonly have in their possession, and at their residences and other locations ("stash houses") where they exercise dominion and control, controlled substances, firearms, ammunition, drug proceeds, and records or receipts pertaining their drug trafficking;

f.   I know that drug traffickers used what is refer to as a "stash house" to stow illegal items such as illegal controlled substance, packaging paraphernalia, illegal firearms, ledgers, and US currency. Often times members of drug trafficking organizations have to make stops at the stash locations to pick up illegal controlled substance to deliver. Additionally, drug traffickers will have customers meet drug traffickers near the stash location.  Multiple stops can be made in a day at these locations. This is done so the trafficker does not have to carry additional illegal controlled substances in their vehicle or person or maintain them at their residence. This protects the trafficker from law enforcement investigations as they do not have illegal controlled substances on them after the delivery is made or inside their personal residence. Often time the US currency will be transported after the

2

delivery to the stash house to protect against law enforcement investigation and rival drug trafficker's robbery crews.

g.  I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking; and

h.  I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry.  I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

4.  I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

5.  The facts in this affidavit come my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; (c) court-authorized electronic communications; and (d) information obtained from cooperating citizen witnesses, confidential sources, and defendants, whose reliability is established herein. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3

6.     Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

7.     Based on the facts set forth in this affidavit, there is probable cause to believe that the crimes of distribution and possession with intent to distribute controlled substances, conspiracy to distribute and possess with the intent to distribute controlled substances, and use of a communications facility to facilitate a drug-trafficking offense, violations of Title 21 United States Code Sections 841(a)(1), 846, and 843(b), have been committed by Duane WILLIAMS (DOB:XX/XX/1998), Anton MATTHEWS (DOB:XX/XX/1996), Lorenzo GOODEN (DOB: XX/XX/1987), Rico L SMITH (XX/XX/1990), Steven P LLOYD (XX/XX/1983) and other known and unknown individuals. There is also probable cause to believe that the location information described in Attachment A will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

## JURISDICTION

8.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9.     Since February 2023, the Drug Enforcement Administration (DEA), the United States Postal Inspection Service (USPIS), and the Wisconsin Department of Justice have been conducting an investigation involving Duane WILLIAMS (DOB:XX/XX/1998), Anton MATTHEWS (DOB:XX/XX/1996), Lorenzo GOODEN (DOB: XX/XX/1987), Rico L SMITH

4

(XX/XX/1990), Steven P LLOYD (XX/XX/1983) and other known and unknown individuals, who are believed to be members of a Milwaukee-area based DTO engaged in the distribution of cocaine/fentanyl and believed to be sourced from California.

**A.    Background**

10.    On February 23, 2023, United States Postal Inspection Service Inspector Kim Lincoln was alerted to a parcel bearing USPS Priority Mail Express tracking number EI 649 372 511 US (wooden crate) being shipped to Jordan Woodman at the address 1940 North 15th Street, Milwaukee, WI, 53205.  The parcel was shipped from California with a return name and address of the "Earthquake Store" located in Burbank California.  The address of 1940 North 15th Street does not exist, and the parcel was not delivered.  Later on February 23, 2023, two individuals showed up at the Hilltop Post Office in Milwaukee, Wisconsin attempting to take custody of the package addressed to Jordan Woodman.  The first individual claimed to be James Woodman and further stated to the employee at the post office that he was the nephew of Jordan Woodman.  The second individual stated they were Jordan Woodman.  However, the post office would not relinquish custody of the package because the address on the ID provided by Jordan Woodman was 1942 North 15th Street which did not match the address the parcel was addressed to.  Inspector Lincoln ultimately discovered that the parcel contained just over two kilograms of fentanyl.

11.    Case agents then examined USPS databases and discovered that this parcel and others were being tracked by IP addresses in both California and Mexico. Case agents identified other packages identical to the initial parcel (EI 649 372 511) containing fentanyl all addressed to Jordan Woodman, two in Milwaukee, one in the Saint Louis, Missouri area, and one in northern Illinois.  On February 27, 2023, case agents were conducting follow-up regarding the parcel (EI 649 372 511) at the Hilltop Post Office when an individual came to the counter attempting to claim

the package.  This person identified himself to Postal Inspectors as Jordan Woodman.  This subject presented an ID Card Receipt from the Wisconsin Department of Transportation issued to Jordan Woodman at 1942 N 15th Street, Milwaukee, WI, 53205.  Once the subject realized that they were speaking with law enforcement officers and not Post Office employees, he and a second subject with him immediately left the post office.  Case agents later determined that the identification Woodman presented was false and positively identified him as Patrick VAUGHN.  Case agents also identified the subject claiming to be "James" (nephew of Jordan Woodman) as James E. JAMES III.  Both JAMES and VAUGHN are Milwaukee residents.

12.     On June 14, 2023, SA Mitchell Ward along with USPIS Inspector Kim Lincoln interviewed Patrick VAUGHN regarding this investigation.  VAUGHN admitted to attempting to retrieve the parcel (EI 649 372 511 US) from the Hilltop Post Office for his drug supplier nicknamed "400" on February 23, 2023.  VAUGHN said he buys small amounts of cocaine and "weed" (i.e., marijuana) from "400".  VAUGHN stated he did not know "400's" real name, but provided his phone number, i.e., 414-627-2727, which VAUGHN used to contact "400" to arrange the purchase of cocaine.  VAUGHN stated that "400" uses various cars to deliver cocaine.  VAUGHN described "400" as a black male, aged between mid-thirties and early-forties, who had a short or bald hairstyle.

13.     Case agents then obtained a court order authorizing them to obtain call information related to telephone 414-627-2727 and reviewed historical call detail records of  telephone 414-627-2727. Case agents recognized VAUGHN's number as one of the top callers to telephone 414-627-2727.  From April 14, 2023 to June 14, 2023 VAUGHN was using telephone number 414-998-7482 and communicated 127 times with telephone 414-627-2727.  Case agents know that

6

VAUGHN's phone number is 414-998-7482 because VAUGHN provided case agents consent to review the contents of his phone when he was interviewed on June 14, 2023.

14.     Additionally, case agents identified another top caller as Bradley DIDENKO of 3142 South Pine Street (lower), Milwaukee, Wisconsin. DIDENKO was using telephone number 414-881-9687 from the time period of April 19, 2023 to June 16, 2023 and call records reflect 365 call between DIDENKO and telephone 414-627-2727. A search of law enforcement databases showed that Jordan MAYRAND also resides at 3142 South Pine Street (lower), Milwaukee, Wisconsin 53207. On June 9, 2023, the West Allis Police Department arrested MAYRAND for several felony drug offenses (Eastern District of Wisconsin case no.: 23-cr-219).

15.     On August, 1, 2023, a State of Wisconsin search warrant was executed at DIDENKO's residence, 3142 S. Pine Ave, Milwaukee, WI. Due to the nature of the search warrant and contact with Law Enforcement, DIDENKO's probation and parole officer put a probation hold on DIDENKO and DIDENKO was taken into custody.

16.     On August 1, 2023, case agents interviewed Bradley DIDENKO. DIDENKO stated that he regularly purchases small amounts of fentanyl from an unknown black male. DIDENKO stated that he calls telephone 414-627-2727 to arrange the purchase of fentanyl. DIDENKO stated the same person does not always deliver the fentanyl to him after he places an order. DIDENKO stated that the "main guy" is a black male who he knows only by the nickname of "Fast." DIDENKO stated that although he recently hasn't seen "Fast," "Fast's workers" last sold him a gram of fentanyl on July 31, 2023. DIDENKO said he typically buys between a half gram and a gram of fentanyl every other day. Case agents know that DIDENKO was using telephone number 414-881-9687 to contact telephone 414-627-2727 because he provided consent

7

for case agents to review the contents of his cellular phone when he was interviewed on August 1, 2023.

17.     On August 16, 2023, case agents spoke with a confidential source (CS-1) regarding this investigation. CS-1 stated that an individual known as "Fast" sells fentanyl and cocaine in the greater Milwaukee area.  CS-1 stated that "Fast" has been using telephone 414-627-2727 to conduct sales of fentanyl and cocaine for the past year.  CS-1 stated that once the order is placed on telephone 414-627-2727, either "Fast" or one of his "crew" delivers the narcotics at various locations in the greater Milwaukee area.   CS-1 stated that most narcotics transactions with "Fast" occur in public areas chosen by "Fast."

18.     I believe that CS-1's information is credible and reliable because CS-1 has given information concerning individuals involved in illegal activities.  CS-1's information has been independently verified through this investigation, including through controlled drug buys, queries of law enforcement databases, and surveillance.  CS-1 has made statements against his/her penal interest.  CS-1 has felony convictions for Manufacture/Delivery Cocaine and Forgery.  CS-1 has no arrests or convictions relating to dishonesty.  CS-1 is cooperating with law enforcement for monetary compensation.  Case agents are aware that CS-1 cooperated with another law enforcement agents in April 2023 and during a controlled buy, CS-1 attempted to keep some of the controlled substances.  Law enforcement confronted CS-1 and CS-1 admitted to that conduct. In relation to the controlled buys outlined below, case agents have conducted surveillance and reviewed the recorded drug buys.  Case agent have not observed any incidents of dishonesty or concerns about CS-1 keeping any of the controlled substances during this investigation.

8

19.     On September 20, 2023, the Honorable Stephen C. Dries, United States Magistrate Judge in the Eastern District of Wisconsin, authorized a warrant for electronic surveillance of telephone number 414-627-2727.

**B.     Controlled Buys**

20.     Based on my training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as the CS-1, purchases drugs from a target at the direction of law enforcement.  For the below outlined controlled buys, the operations were generally conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CS was used, she/he was searched for contraband, weapons, and money before the operation. The CS was also wired with a concealed body recorder and/or a monitoring device. When the transaction was completed, the CS met cases agents at a pre-determined meet location and gave the purchased drugs and the recording/monitoring equipment to the case agents.   The CS was again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction.  A sample of the suspected drugs was then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures.  Further, often the calls to the target by the CS, which were consensually recorded calls, were done under the direction and control of case agents and/or made in the presence of case agents.

21.     Under the direction of case agents CS-1 made a total of six controlled buys by communicating with the holder of telephone 414-627-2727.

**a.     October 5, 2023 Controlled Buy - Anton MATTHEWS**

22.     On October 5, 2023, CS-1 arranged to purchase 1 gram of crack cocaine and 1/2 gram of fentanyl for $130 USC by calling 414-627-2727.  Telephone 414-627-2727  was answered

9

by an unknown male who directed CS-1 to come to 4936 North 40th Street, Milwaukee, Wisconsin to complete the transaction. CS-1 explained to case agents that 4936 North 40th Street was a location often used by this DTO, and stated they had been directed to this address on several occasions. CS-1 stated that this was a residential address with a long wheelchair ramp coming from the front door and extending towards the street. Approximately five minutes after CS-1 confirmed the location, CS-1 received another call from telephone 414-627-2727 and CS-1 was then instructed to meet in the area of 7th Street and Capitol in Milwaukee. CS-1 stated they'd been to this area in the past to conduct transactions and believed there was a house in this area where they would be directed. CS-1 did not recall an exact address.

23.     Surveillance had already been established in the area of 7th Street and observed a silver Jeep Cherokee, bearing Wisconsin plates ALY-1398 (Jeep) arriving in front of 4076 North 7th Street. According to the Wisconsin Department of Transportation, ALY-1398 is registered to Anton MATTHEWS at 4076 North 7th Street, and case agents positively identified MATTHEWS as the driver of the Jeep based on MATTHEWS driver's license photograph. MATTHEWS was observed exiting the Jeep and walking to the front porch area of 4076 North 7th Street. A short time later, MATTHEWS was observed walking back toward the Jeep and entering the driver's seat. MATTHEWS was then observed pulling away from the front 4076 North 7th Street and immediately pulling over around the corner on Fiebrantz Avenue, just East of 7th Street.

24.     CS-1 received another phone call from telephone 414-627-2727 shortly after the Jeep pulled around the corner. CS-1 was instructed to meet near the alley that runs behind the 7th Street address. CS-1 was then observed by case agents arriving in the area and pulling directly behind the Jeep on Fiebrantz Avenue. CS-1 was observed by case agents exiting the CS vehicle and entering the front passenger seat of the Jeep. CS-1 was inside the Jeep for approximately two

10

minutes. While inside the Jeep, CS-1 obtained suspected controlled substances in exchange for $130. CS-1 then exited the Jeep and returned to Cs-1's vehicle. CS-1 was followed directly back to the predetermined meet location by case agents where CS-1 turned over two small baggies, one containing suspected crack cocaine and one containing suspected fentanyl. The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results. CS-1 was later shown a driver's license photograph of Anton MATTHEWS, who CS-1 positively identified as the individual who sold CS-1 the suspected crack cocaine and suspected fentanyl inside the Jeep. CS-1 stated that MATTHEWS was not the individual CS-1 knew as "Fast."

25.     Case agents reviewed recordings of the telephone calls detailed above and the recording made by CS-1 of CS-1's interaction with MATTHEWS and said recordings corroborate the information provided by CS-1 about what occurred during this transaction.

**b.     October 12, 2023 Controlled Buy - Lorenzo GOODEN**

26.     On October 12, 2023, under the direction of case agents, CS-1 conducted a controlled purchase of fentanyl and crack cocaine with the DTO. CS-1 called telephone number 414-627-2727 and it was answered by an unknown male. CS-1 was instructed to come to the area of 1st Street and National in Milwaukee, Wisconsin. CS-1 was followed by case agents to the area of 1st Street and National where surveillance had already been established. CS-1 parked on the south side of East Florida Street to the east of 1st Street, Milwaukee, Wisconsin. Approximately two minutes later, case agents observed a black Nissan SUV, bearing Wisconsin plates AKF-5062 (Nissan) arrive in the area and park on the opposite side of Florida Street from CS-1's vehicle.

27.     CS-1 exited his/her vehicle and entering the front passenger seat of the Nissan. The Nissan then pulled away east on Florida Street and pulled over in the area of Florida Street and

11

Water Street.  The Nissan stopped for a very brief period of time at Florida Street and Water Street and then drove back to where CS-1's vehicle was parked.  CS-1 exited the Nissan and got back into CS-1's vehicle.  While inside the Nissan, CS-1 obtained suspected controlled substances in exchange for $130.  The Nissan was under constant visual surveillance by case agents for the duration of the interaction with CS-1.  CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time.  Once back at the predetermined location CS-1 handed over two small baggies, one containing suspected crack cocaine and the other containing suspected fentanyl.  The suspected crack cocaine and suspected fentanyl weighed approximately 1 gram each and were later subjected to field tests where they both yielded positive results.

28.     CS-1 was later shown a photograph of GOODEN, who CS-1 positively identified as the individual in the black Nissan who had sold CS-1 the suspected crack cocaine and suspected fentanyl.  CS-1 stated that GOODEN was not the individual CS-1 knew as "Fast."  Case agents also compared the video recording from the buy and booking photographs of GOODEN and positively identified GOODEN as the individual that sold CS-1 fentanyl and crack cocaine. Case agents reviewed recordings of the telephone calls detailed above and the recording made by CS-1 of CS-1's interaction with GOODEN and said recordings corroborate the information provided by CS-1 about what occurred during this transaction.

**c.     October 26, 2023 Controlled Buy - Duane WILLIAMS**

29.     On October 26, 2023, under the direction of case agents, CS-1 conducted another controlled purchase of 1/2 gram of fentanyl and 1 gram of crack cocaine for $130 USC.  CS-1 called telephone 414-627-2727, which was again answered by an unknown male.  CS-1 was instructed to come to the area of 7th Street and Walnut in Milwaukee, Wisconsin.  CS-1 was then

12

directly followed by case agents to the area of North 7th and Walnut where surveillance had already been established. CS-1 ultimately parked the CS-1's vehicle on West Reservoir Avenue just to the west of North 7th Street. Approximately twenty minutes after CS-1 parked on West Reservoir Avenue, case agents observed a silver Honda Accord car bearing Wisconsin plates ANY-6044 (Accord) arrive in the area and park near the CS vehicle. CS-1 was then observed exiting the CS-1's vehicle and walking to the Accord. CS-1 was observed leaning into the passenger window of the Accord for approximately three minutes. While leaning into the Accord, CS-1 obtained suspected controlled substances in exchange for $130. CS-1 then walked back to CS-1's vehicle and departing the area. CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time. Once back at the predetermined location CS-1 handed over approximately one gram of suspected fentanyl and one gram of suspected crack cocaine to case agents. The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results.

30.     Utilizing a law enforcement database, case agents were able obtain and compare booking photographs and determined that Duane WILLIAMS (DOB: XX/XX1998) was the driver of the Accord. CS-1 was later shown a photograph of WILLIAMS to which CS-1 positively identified as the individual who had sold CS-1 the suspected crack cocaine and suspected fentanyl. CS-1 further stated that CS-1 believes that WILLIAMS lives at 4936 North 40th Street, Milwaukee, Wisconsin, due to previous interactions with WILLIAMS at this address. CS-1 stated that during the deal with WILLIAMS, CS-1 observed a Glock with an extended magazine tucked in between the driver's seat and the center console of WILLIAMS vehicle in plain view. Case agents reviewed recordings of the telephone calls detailed above and the recording made by CS-1

13

of CS-1's interaction with WILLIAMS and said recordings corroborate the information provided by CS-1 about the drug transaction.

31. Case agents also reviewed WILLIAMS' criminal history. On July 16, 2019, WILLIAMS was convicted of the felony offense of Vehicle Operator Attempting to Flee/Elude Officer in Milwaukee County Case Number 2019CF1598.

32. During surveillance at 4936 North 40th Street, Milwaukee, Wisconsin, I also observed the Accord parked in the driveway at on multiple occasions. Additionally, case agents observed DIDENKO meet with the Accord on July 31, 2023 in the alley behind DIDENKO's residence, 3142 South Pine Street (lower), Milwaukee, Wisconsin. On this occasion, case agents observed what appeared to be a hand-to-hand drug transaction between DIDENKO and the driver of the Accord.

### d. November 13, 2023 Controlled Buy - Duane WILLIAMS

33. On November 13, 2023, under the direction of case agents, CS-1 conducted another controlled purchase of fentanyl and crack cocaine in exchange of $130 USC. Case agents met CS-1 at a predetermined location and CS-1 called telephone number 414-627-2727, and the call went unanswered. A few moments later CS-1 received an incoming call from telephone number 414-627-2727 and the individual calling instructed CS-1 to go to the area of North 41st Street and West Hampton Avenue. CS-1 believed the person utilizing telephone number 414-627-2727 was the same individual (Duane WILLIAMS) that CS-1 had met with on October 26, 2023 based on the sound of the voice.

34. CS-1 was followed by case agents to the 4500 block of North Sherman Boulevard. At this point, CS-1 received an incoming call from telephone number 414-627-2727 and was directed to go to the area of North 14th Street and West Capitol Drive. Prior to CS-1 arriving, case

14

agents established surveillance in the 3900 block of North 14th Street in anticipation of the deal. Once arriving in the area case agents observed Duane WILLIAMS occupying the driver's seat of the Accord which was parked in front of 3943 North 14th Street. Case agents also observed an unknown female passenger in the Accord.

35.     Once CS-1 arrived in the area CS-1 was observed parking on the west side of the street, directly in front of the Accord. CS-1 was then observed exiting CS-1's vehicle and walking to the passenger side of the Accord where CS-1 engaged with the occupants of the Accord through the open passenger window. CS-1 completed the controlled purchase and was observed walking back to CS-1's vehicle and departing the area. CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time.

36.     Once back at the predetermined location CS-1 handed over approximately one gram of suspected fentanyl and one gram of suspected crack cocaine to case agents. The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results.

37.     CS-1 stated that they had observed two Ziplock bags in WILLIAMS' lap, one containing what appeared to CS-1 as "at least five ounces of purple fentanyl" and the other contained what appeared to contain "three ounces of cocaine." CS-1 stated that WILLIAMS retrieved small amounts of both substances and weighed them on a small digital scale located on the arm rest of the Accord. CS-1's statements were corroborated by the Audio and Video recording device that CS-1 was equipped with during this transaction.

**e.     November 30, 2023 Controlled Buy - Duane WILLIAMS**

38.     On November 30, 2023, under the direction of case agents, CS-1 conducted another controlled purchase of fentanyl and crack cocaine in exchange of $130 USC. Case agents met CS-

15

1 at a predetermined location and CS-1 called telephone 414-627-2727, and the call went unanswered. A few moments later, CS-1 received an incoming call from the telephone 414-627-2727. CS-1 answered the call and was ultimately instructed to come to the area of North 40th Street and West Hampton Avenue. Case agents were already aware that Duane WILLIAMS lived at 4936 North 40th Street and surveillance units were sent to that location after the phone call between CS-1 and telephone 414-627-2727. Once surveillance units were established, a black Maserati sedan (Maserati) was observed back into the driveway of 4936 North 40th Street and case agents observed a black male occupying the driver's seat. CS-1 was followed by case agents from predetermined location to the area of the 4900 block of North 40th Street and park CS-1's vehicle on the East side of the road. CS-1 was observed walking to the Maserati and engaging with the driver of the vehicle through the open driver's window. CS-1 conducted the drug transaction and was then observed walking back to the CS vehicle and departing the area. CS-1 was then followed back to the predetermined meeting location by case agents and was under constant visual surveillance the entire time.

39. Following the controlled purchase case agents again met with CS-1 at a predetermined location. Once at the predetermined location CS-1 handed over approximately one half gram of suspected fentanyl and one half gram of suspected crack cocaine to case agents. The suspected crack cocaine and suspected fentanyl were later subjected to field tests where they both yielded positive results. CS-1 stated CS-1 had observed two plastic Ziploc bags in WILLIAMS' lap, one containing what appeared to CS-1 to be "a large amount of purple fentanyl" and the other contained what appeared to contain "an ounce of cocaine." CS-1 stated that WILLIAMS had retrieved small amounts from each bag and weighted them on a small digital scale located on the arm rest of the Maserati and then handed CS-1 loose amounts of each product, without a container.

16

CS-1 also observed a large stack of US Currency located near the gear shifter of the Maserati that CS-1 estimate to be six inches thick. Case agents reviewed recordings of the telephone calls detailed above and the recording made by CS-1 of CS-1's interaction with WILLIAMS and said recordings corroborate the information provided by CS-1 about the drug transaction.

### f. January 23, 2024 Controlled Buy – Rico SMITH

40.     On January 23, 2024, under the direction of case agents, CS-1 conducted another controlled purchase of crack cocaine in exchange $130 USC. Case agents met CS-1 at a predetermined location and CS-1 called telephone 414-627-2727, and CS-1 was directed by a male voice to come to the area of 3rd Street and West Scott in Milwaukee, Wisconsin. CS-1 was followed from the predetermined location to the area of 3rd and Scott where surveillance had already been established. CS-1 was observed parking near the intersection of South 3rd Street and West Scott. Just a few moments later case agents observed a black Acura SUV, Wisconsin plate AMZ-2064 (Acura) arrive and park on the opposite side of the street as CS-1's vehicle. CS-1 was observed exiting CS-1's vehicle and walking to the Acura and engaging with the driver of the Acura through the open driver's window. CS-1 and the driver conducted the drug transaction at this point. CS-1 ultimately walked back to CS-1's vehicle and departed the area. Surveillance was terminated shortly after this transaction and the Acura was not followed away from the area.

41.     Following the controlled purchase, case agents again met with CS-1 at a predetermined location. Once at the predetermined location CS-1 handed over a small plastic baggie containing suspected crack cocaine. The suspected crack cocaine was later subjected to field tests where it yielded positive results. The suspected cocaine was approximately 2.2 grams.

42.     CS-1 later stated to case agents that the individual driving the black Acura was the individual CS-1 knew as "Fast." Case agents later positively identified "Fast" as Rico L. SMITH

17

by comparting surveillance photographs to SMITH's Wisconsin Driver's license photograph. CS-1 was also shown a Wisconsin Driver's License photograph of SMITH with no name or identifies visible and CS-1 positively identified the photograph as the individual CS-1 knew to be "Fast." Additionally, the Acura, driven by SMITH, is registered to Kimberly NEAL, with an address of 623 West Clarke Street, Milwaukee, Wisconsin. Based on my training and experience, I know that it's common for drug traffickers to use vehicles not registered to themselves to avoid identification. Through previous law enforcement contacts and reports reviewed, case agents believe that NEAL is SMITH's girlfriend. Case agents reviewed recordings of the telephone calls detailed above and the recording made by CS-1 of CS-1's interaction with SMITH and said recordings corroborate the information provided by CS-1 about the drug transaction.

### g. May 9, 2024 Controlled Buy - Duane WILLIAMS

43. In May 2024, case agents developed a confidential source (CS-2) who stated they could purchase fentanyl from a subject CS-2 knew as "BJ." CS-2 provided telephone number (262) 412-5521 as the number that CS-2 uses to contact "BJ." Case agents were already aware through law enforcement database checks that the owner or holder of telephone number (262) 412-5521 was Duane WILLIAMS, who resides at 4936 North 40th Street, Milwaukee, Wisconsin. Case agents provided a photograph of WILLIAMS to CS-2, who identified the person in the photograph as "BJ." CS-2 stated that "BJ" lived near 40th and Hampton in Milwaukee and further said that "BJ" lived in a house that had a long wheelchair ramp. Case agents are aware that WILLIAMS's residence is approximately two blocks north of Hampton Avenue, directly on North 40th Street, and has a long wheelchair ramp that extends from the front door down to the sidewalk. CS-2 stated that "BJ" typically charges $80 per gram of fentanyl.

18

44.     I believe that CS-2's information is credible and reliable because CS-2 has given information concerning individuals involved in illegal activities.  CS-2's information has been independently verified through this investigation, including through controlled drug buys, queries of law enforcement databases, and surveillance.  CS-2 has made statements against his/her penal interests.  CS-2 has one felony conviction for flee/elude traffic officer.   CS-2 has no arrests or convictions relating to dishonesty.   CS-2 is cooperating with law enforcement for judicial consideration related to a felony criminal investigation.

45.     On May 9, 2024, under the direction of case agents, CS-2 arranged to purchase $600 worth of fentanyl from WILLIAMS by communicating with WILLIAMS who was using telephone number (262) 412-5521.  During the call, WILLIAMS told CS-2 that he was on 40th Street.  Case agents and CS-2 already knew that WILLIAMS resided at 4936 North 40th Street, Milwaukee, Wisconsin.  At this time, case agents dispatched surveillance units to the area of 4936 North 40th Street.  Case agents then followed CS-2 from the predetermined meeting location to the vicinity of 4936 North 40th Street, Milwaukee, Wisconsin.  Once CS-2 arrived in that area, CS-2 placed another call to telephone number (262) 412-5521 and was instructed by WILLIAMS to go inside the residence and retrieve the fentanyl from a green boot.  WILLIAMS further instructed CS-2 to leave the money inside the boot.  Case agents observed CS-2 exit CS-2's vehicle and enter the front door of 4936 North 40th Street, Milwaukee, Wisconsin where CS-2 was out of the case agents' view for a few moments.  Case agents later learned from CS-2 that once inside, CS-2 retrieved fentanyl from a boot and left $600, before exiting the front door.  Case agents observed CS-2 return to CS-2's vehicle and depart the area.  Case agents directly followed CS-2 from WILLIAMS's residence to a predetermined meeting location.

46.     Once at the meeting location, case agents recovered from CS-2 a plastic sandwich bag that contained a greyish/purple substance suspected to be fentanyl.  The suspected fentanyl had a weight of 6.4 grams and was later subjected to a field test where it yielded positive results for the presence of fentanyl.  Case agents later reviewed the audio/video captured by CS-2 during the controlled buy and found it to corroborate CS-2's version of events.

### g.     June 3, 2024 – Controlled Buy - Duane WILLIAMS

47.     On June 3, 2024, under the direction of case agents, CS-2 arranged to purchase $400 worth of fentanyl from WILLIAMS by communicating with WILLIAMS who was using the telephone number (262) 412-5521.  During the call, WILLIAMS directed CS-2 to come to the area of 86th and Silver Spring in Milwaukee, Wisconsin.

48.     Case agents followed CS-2 from the predetermined location to the area of N 91st Street and Silver Spring.  At that time, case agents monitoring CS-2's active audio/video devices overheard CS-2 receive a call from WILLIAMS, who directed CS-2 to come to the alley between North 90th and North 91st Street to the north of West Thurston Avenue.  Case agents maintained visual contact with CS-2 as CS-2 turned north on North 91st Street, east on West Thurston Avenue, and then made an immediate left turn into the alley between North 90th and North 91st Street.  As CS-2 pulled into the alley, case agents observed a gray SUV parked in the middle of the alley.  Case agents observed a heavyset black male standing next to the passenger side of the SUV engaging with the driver through the open passenger window.  Case agents observed CS-2 pulling up to the SUV's driver's side window and engage with the driver of the gray SUV through both vehicles' open driver's side windows.  As CS-2 pulled up to the window of the SUV, the unknown black male that was standing next to the passenger side was observed walking away from the SUV

20

and entering the apartment building 5670 North 91st Street, Milwaukee, Wisconsin, using the lower-level northeast corner door of the building (Figure 1).



(Figure 1)

49.    Your affiant observed CS-2 hand a white plastic bag to the SUV's driver and then, moments later, observed the SUV's driver throw a white plastic bag into CS-2's vehicle through its open driver's side window.  Case agents then observed CS-2 depart the area of the buy and drive to a nearby parking lot as directed by case agents.  Case agents directly followed CS-2 from the area of the buy to the meeting location.  At no time was CS-2 out of the case agents' sight.

50.    Once at the meeting location, CS-2 provided case agents with a white plastic grocery bag that contained a white rock-like substance suspected to be fentanyl.  CS-2 stated that some of the suspected fentanyl had fallen out of the bag when thrown into CS-2's vehicle during

21

the controlled buy. Case agents thoroughly searched CS-2 and CS-2's vehicle and recovered several small pieces of suspected fentanyl from the passenger seat and floorboard area of CS-2's vehicle. CS-2 positively identified the driver of the gray SUV as "BJ" (WILLIAMS). CS-2 said "BJ" provided CS-2 the suspected fentanyl in exchange for $400. The suspected fentanyl was left in the plastic grocery bag and had a total gross weight of 13.1 grams. The suspected fentanyl was later subjected to a field test where it yielded positive results for the presence of fentanyl. Case agents reviewed recordings of the telephone calls detailed above and the recording made by CS-2 of CS-2's interaction with WILLIAMS and said recordings corroborate the information provided by CS-2 about the drug transaction.

51.    As the gray SUV exited the area of the controlled purchase, case agents were able to identify the vehicle as a Maserati SUV bearing Wisconsin plate AVP-9573 (SUV). According to the Wisconsin Department of Transportation, this plate lists to a 2018 gray Maserati Levante and is registered to Dantavia Vernard Rule with an address of 161 West Wisconsin Avenue, #225, Milwaukee, Wisconsin. The SUV was not surveilled as it departed the area due to its erratic driving behavior.

52.    In preparation for this controlled purchase, case agents had also dispatched surveillance units to the area of WILLIAMS's residence, located at 4936 North 40th Street, Milwaukee, Wisconsin. Approximately 10 minutes after WILLIAMS left the alley where the controlled purchase took place, surveillance units observed the SUV arrive and park in the driveway of WILLIAMS's residence. Surveillance units were able to determine the plate on the vehicle to be AVP-9573 and also observed a black male exit the SUV and enter 4936 North 40th Street. Minutes after the black male entered the residence, the same black male exited the front door at which time DEA Special Agent Julia Gray obtained photographs of this black male. I later

22

viewed these photographs and positively identified the black male depicted in the photographs as Duane WILLIAMS.

### h.    August 15, 2024 – Controlled Buy - Duane WILLIAMS

53.    On August 15, 2024, under the direction of case agents, CS-2 arranged to purchase $240 worth of fentanyl from WILLIAMS.  CS-2 provided telephone number 414-308-2767 as a number CS-2 had recently received from WILLIAMS as WILLIAMS new telephone number.  CS-2 made telephone contact with WILLIAMS by calling 414-308-2767.   During the call, WILLIAMS directed CS-2 to come to the area of 91st and Silver Spring in Milwaukee, Wisconsin.

54.    Case agents followed CS-2 from the predetermined location to the area of North 91st and Silver Springs in Milwaukee, Wisconsin.  CS-2 was observed turning north on North 91st from Silver Spring and then east on West Thurston Avenue.  CS-2 then made an immediate north bound turn into the alley between North 91st and North 90th Street where the CS was observed parking in the alley.  Just moments before CS-2 was observed entering the alley, case agents observed a silver Honda Accord, Wisconsin Plate AXX-8065 (silver Honda) pull into the alley and park on the parking slab approximately three structures north of Thurston on the west side of the alley.  Wisconsin plate AXX-8065 is registered to Jaia DOUGLAS with a registered address of 4605 North 48th Street, Milwaukee, Wisconsin.  DOUGLAS is the known girlfriend of Duane WILLIAMS.

55.    As CS-2 was observed parking, case agents observed a subject that was later positively identified as WILLIAMS exit the silver Honda and engage with CS-2 through CS-2's open driver's side window.  Case agents monitoring the audio/video device CS-2 was equipped with overheard WILLIAMS tell CS-2, "let me go get it together."  WILLIAMS was then observed walking from CS-2's vehicle to 5670 North 91st Street, Milwaukee, Wisconsin and entering the

23

location using the lower-level northeast corner door of the building (previously depicted in Figure 1). After several minutes, case agents observed CS-2 exit CS-2's vehicle and walk to the same lower-level northeast corner door of 5670 North 91st Street, Milwaukee, Wisconsin (previously depicted in Figure 1) where CS-2 could be observed interacting with someone in the threshold of the lower-level northeast corner door. CS-2 remained in the doorway for just a brief moment and was then observed walking back to CS-2's vehicle and departing the area. Case agents then directly followed CS-2 away from the location back to a predetermined location. At no time was CS-2 out of view of case agents.

56.     Once at the predetermined location, CS-2 handed over a small baggie containing suspected fentanyl that was purple in color. CS-2 positively identified WILLIAMS as the subject that had provided the baggie of suspected fentanyl to CS-2 while CS-2 was in the lower-level northeast corner doorway of 5670 North 91st Street, Milwaukee, Wisconsin. CS-2 stated that when CS-2 initially arrived in the alley, CS-2 saw WILLIAMS walking from the silver Honda to CS-2's vehicle. CS-2 stated that they believed WILLIAMS had the fentanyl at this time and had handed WILLIAMS the buy money. CS-2 stated that after WILLIAMS took the buy money, WILLIAMS said that he had to go get it (referring to the fentanyl). CS-2 stated that CS-2 saw WILLIAMS walk into the third apartment building to the north of West Thurston Avenue, and further stated that WILLIAMS entered the door on the ground floor farther to the right when looking at the rear of the structure, identified by case agents as lower-level northeast corner door of 5670 North 91st Street, Milwaukee, Wisconsin (depicted in Figure 1). CS-2 stated that after several minutes, CS-2 observed WILLIAMS in the lower-level northeast corner doorway of 5670 North 91st Street, Milwaukee, Wisconsin waving for CS-2 to come to the doorway. CS-2 stated that at this time CS-2 left CS-2's vehicle and went to the lower-level northeast corner doorway of 5670 North 91st

24

Street, Milwaukee, Wisconsin where WILLIAMS was currently weighing out the fentanyl on a scale inside the apartment unit. CS-2 stated that CS-2 observed three other unidentified black males inside the northeast corner unit of the lower level apartment unit of 5670 North 91st Street, Milwaukee, Wisconsin. CS-2 also observed additional fentanyl in plain view inside this apartment unit of 5670 North 91st Street, Milwaukee, Wisconsin. CS-2 further stated that it appeared the apartment unit located in lower-level northeast corner of 5670 North 91st Street, Milwaukee, Wisconsin was a stash house of some kind used by WILLIAMS based on the number of unknown individuals inside and the fact that drugs and scales were in plain view from the doorway. Case agents do not believe WILLIAMS resides at the 5670 North 91st Street, Milwaukee, Wisconsin. On the morning of August 16, 2024, I observed the silver Honda parked in the driveway of 4936 North 40th Street, Milwaukee, Wisconsin, consistent with WILLIAMS still residing at that location.

57. The suspected fentanyl the CS-2 provided to case agents totaled 4.1 grams. The suspected fentanyl was later subjected to a field test where it yielded positive results for the presence of fentanyl. Case agents reviewed recordings of the telephone calls detailed above and the recording made by CS-2 of CS-2's interaction with WILLIAMS and said recordings corroborate the information provided by CS-2 about the drug transaction.

## C. Arrest of Deangelo ALBOYD-BROWN

58. On April 15, 2024, Deangelo ALBOYD-BROWN (DOB: XX/XX/1992) was arrested during the execution of a federal search warrant at 2533 W. Monroe Street, Milwaukee, Wisconsin. Case agents located a suspicious parcel in the mail stream that was addressed to Shirley Alexander, 2533 W. Monroe Street, Milwaukee, WI. The sender of the package was John Alexander, 17167 N. 9th #1107, Phoenix, Arizona. A search of law enforcement databases

25

indicated the sender name and address and recipient name shown on the shipping label were fictious. On April 12, 2024, case agents obtained a federal search warrant signed by U.S. Magistrate Judge William Duffin to search the suspicious parcel and found it to contain approximately 530 grams (with packaging) of blue M30 Oxycodone pills. The pills were confirmed to be counterfeit and contained fentanyl per laboratory analysis. ALBOYD- BROWN was searched upon his arrest and was found to have a purple and yellow sock in his lower left cargo pocket. The sock contained two clear plastic bags filled with a white powdery/chunky substance and one clear plastic bag that contained a purple powdery substance. The bags of white powdery/chunky substance had a combined weight of 30.9 grams and field tested positive for the presence of cocaine. The purple powdery substance had a weight of 1.63 grams and field tested positive for the presence of fentanyl. Case agents also recovered a large sum of money inside ALBOYD- BROWN's left cargo pocket, a weighmax digital scale in his right cargo pocket, a silver and black iPhone with a large sum of money in his right front pants pocket. In total the currency recovered from ALBOYD- BROWN's person totaled $4,010.00. ALBOYD- BROWN also had two black iPhones in his right hand when he was taken into custody.

59. On April 16, 2024, the Honorable Barry Phillips, Court Commissioner of the First Judicial District signed a State of Wisconsin search warrant allowing the search/examination of the three cellular phones located on ALBOYD- BROWN during his arrest. I have reviewed portions of the data extractions for two of the three iPhones recovered from ALBOYD- BROWN. One of the iPhones recovered had an assigned telephone number of 414-627-2727, which is the same telephone number used to make controlled purchases from Anton MATHEWS, Duane WILLIAMS, Lorenzo GOODEN, and Rico SMITH. The other iPhone had an assigned telephone number of 414-315-2807. Both phone extractions contained numerous text messages exchanges

that based on my training and experience were related to the distribution of narcotics. It was also evident based on my training and experience that the phones recovered from ALBOYD- BROWN were the phones being used to sell the narcotics and not purchase them.

### D. Arrest of Duane WILLIAMS

60. On September 4, 2024, Duane WILLIAMS was taken into custody by members of the Milwaukee County Sheriff's Department after WILLIAMS was traffic stopped on I-94 near Rawson Road in Milwaukee, Wisconsin. WILLIAMS was subsequently interviewed by case agents related to his involvement with the distribution of cocaine and fentanyl in the city of Milwaukee. WILLIAMS also provided written consent to case agents during this interview for case agents to search two iPhones that were recovered from WILLIAMS during the traffic stop.

61. I reviewed data contained in the cellular phones WILLIAMS provided consent to search. WILLIAMS was using telephone numbers 262-412-5521 and 414-308-2767. WILLIAMS had a contact saved under the name of "Rico" in WILLIAMS' telephone with the assigned number of 262-412-5521. "Rico" had an assigned telephone number of 414-316-0463. In a text message conversation between WILLIAMS and 414-316-0463 on April 16, 2024, which was one day after ALBOYD- BROWN's arrest, WILLIAMS asked, "What's the other number" to which 414-316-0463 responded with "3152807" and "6272727" which were the telephone numbers of two cellular phones referenced above that were recovered from ALBOYD- BROWN. The 414-316-0463 also said, "Bro u slow the whole time I'm telling u to change the phone over to a flip u thought I want some cheap as phone to have bitch." Through my training and experience, I believe the last message from 414-316-0463 was directing WILLIAMS to change or "port" the phone numbers of the phones recovered from ALBOYD- BROWN to new phones indicating that the holder of 414-316-0463 is a leader within this organization.

27

62.     During WILLIAMS' *Mirandized* interview, WILLIAMS stated to case agents that WILLIAMS knew a subject that went by the name of "Man-Man," who case agents know to be Lorenzo GOODEN.   WILLIAMS was provided with a photograph of GOODEN to which WILLIAMS positively identified as the subject WILLIAMS knew to be "Man-Man."   WILLIAMS stated that GOODEN would provide WILLIAMS with cellular phones and approximately one ounce of purple fentanyl at a time and WILLIAMS would sell the fentanyl for GOODEN. WILLIAMS stated that the "627 number" was GOODEN's and later clarified that he was referring to telephone number 414-627-2727.   WILLIAMS stated that it was always GOODEN that would deliver the phones to WILLIAMS and WILLIAMS estimated that he would be in possession of the phones a few times per month.   WILLIAMS could not recall the telephone number to the second phone, and was only able to remember the 627-2727 telephone number.

63.     WILLIAMS was asked during the interview if he knew anyone else that would be in the area of WILLIAMS' mother's house located on N. 57th Street in the city of Milwaukee. WILLIAMS stated, "if you're talking about my cousin, he don't be there anymore."   WILLIAMS further stated that his cousin was "Rico."   WILLIAMS was then asked if his cousin knew any of the people that had been discussed during the interview in reference to the telephones being passed around to sell fentanyl and WILLIAMS pointed at the photograph of GOODEN which was still laying on the interview table and said, "these his guys" to which case agents understood WILLIAMS to mean "Rico" was a leader within the organization.   It should be noted that during the controlled buy on January 23, 2024, when telephone number 414-627-2727 was called, Rico SMITH showed up to the meeting location and sold crack cocaine to CS-1.

**E.     Identification of Telephone 773-708-4858 (Target Cell Phone)**

64.     On January 3, 2025, case agents interviewed CS-3 regarding an ongoing fentanyl trafficking investigation being led by the United States Postal Inspection Service and the US Department of Justice-Drug Enforcement Agency. CS-3 positively identified a photo of Steven P. LLOYD XX/XX/1983 as a kilogram level fentanyl trafficker known to CS-3 as "Pistol Pete." CS-3 has known LLOYD for over three years and has purchased quantities of fentanyl from LLYOD from 100 grams to a kilogram. CS-3 stated that both Rico SMITH and Lorenzo GOODEN had obtained kilograms of fentanyl from LLOYD. CS-3 stated that LLOYD typically charges $45,000 for one kilogram of fentanyl.

65.     CS-3 is credible and reliable because CS-3 has provided intelligence concerning drug trafficking activities for known persons identified in this investigation that have been independently corroborated through queries of law enforcement databases, law enforcement investigations and information gathered during this case. CS-3 has also made statements against his/her own penal interests. CS-3has 5 felony convictions. CS-3 has no arrests or convictions relating to dishonesty. CS-3 is cooperating with law enforcement in exchange for consideration regarding felony drug trafficking offenses.

66.     CS-3 stated that CS-3 has purchased fentanyl from LLOYD in the past year. CS-3 states that he/she would drop money off to LLOYD at a predetermined location. LLOYD would then call CS-3 within an hour to return and take delivery of the fentanyl. CS-3 would be given the locations for these transactions by Facetime calls with LLOYD. CS-3 provided case agents with the number of **773-708-4858** (**Target Cell Phone** ) as belonging to Steven LLOYD. CS-3 stated that they typically communicate via video calls and not by making traditional phone calls. CS-3 stated that this is intentionally done to thwart the efforts of law enforcement to capture

communications. Case agents later spoke again with CS-3 and confirmed that CS-3 last spoke to LLOYD at the **773-708-4858 (Target Cell Phone)** on January 25, 2025.

67. Case agents obtained subscriber and call history for telephone number **773-708-4858** (**Target Cell Phone**) provided by CS-3. The subscriber list for telephone number **773-708-4858 (Target Cell Phone)** is Malcom Boone XX/XX/1995. Case agents reviewed law enforcement databases and determined Malcome Boone is wanted regarding narcotics offenses in Milwaukee County. Case agents are aware that narcotics traffickers often use others to title vehicles, own property or subscribe to phone plans to hide their activities from the government. Case agents are also aware that it is common for higher level drug traffickers to use other subordinate members of a drug trafficking organization. Case agents obtained subscriber and other device information for telephone number **773-708-4858** (**Target Cell Phone**), which confirmed that the device's IMEI number is 310280142049946 and its wireless provider is AT&T.

68. Case agents reviewed the call history for telephone number **773-708-4858** (**Target Cell Phone**). Case agents observed that the number one contact with telephone number **773-708-4858 (Target Cell Phone)** is telephone number 414-915-3257. Case agents reviewed law enforcing databases and determined that telephone number 414-915-3257 appears to belong to Kimberly Lloyd. Kimberly Lloyd provided this number to the City of Milwaukee on a license application dated March 1, 2024. Further review of law enforcement database appear to indicate that Kimberly Lloyd is LLOYD's wife. There were 376 contacts between LLOYD and Kimberly Lloyd from November 16, 2024, through January 16, 2025.

69. Case agents observed that the number with the second most contacts with **773-708-4858** (**Target Cell Phone**) was telephone number 414-791-6960. Case agents reviewed law enforcement database and determined telephone number 414-791-6960 is connected with Malcom

30

Boone. Boone provided this number as his cell phone to the Milwaukee Police Department on December 23, 2024. There were 179 contacts between Boone and telephone number **773-708-4858 (Target Cell Phone)** from November 24, 2024, through January 16, 2025.

70.     Case agent also obtained a visitors list for LLOYD from the Wisconsin Department of Corrections. LLYOD was incarcerated in Wisconsin until his release in 2020. Case agents noted that Malcom Boone, Kimberly Lloyd, Peggy Brown, Porsha Carson and Antonio Spence were all on LLOYD's visitor log, Brown identified herself to the Wisconsin Department of Corrections as LLOYD'S mother. Case agents reviewed the top ten most frequent callers to telephone number **773-708-4858 (Target Cell Phone)** and observed that in addition to telephone numbers 414-915-3257 (Kimberly Lloyd), and 414-791-6960 (Boone), telephone numbers 414-775-5217, 262-225-8008, and 414-630-7357 were also listed. Case agents reviewed a database and contact names and identified Peggy Brown associated with telephone number 414-775-5217, Porsha Carson associated with telephone number 262-225-8008, and Floss Trucking LLC/Antonio Spencer associated with telephone number 414-630-7357. Based upon this, case agents believe that LLOYD is the current user of telephone number **773-708-4858 (Target Cell Phone).**

71.     Case agents also learned that LLOYD is currently wanted by the Wisconsin Department of Corrections. LLOYD has been listed as an absconder since May of 2023. I believe that tracking the location of telephone number **773-708-4858 (Target Cell Phone)** will allow case agents to locate LLOYD and to identify possible drug stash locations based upon locations frequented by LLOYD.

## TECHNICAL BACKGROUND

*72.*     Based on my training and experience, I know that Service Provider can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about

31

the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on Service Provider's network or with such other reference points as may be reasonably available.

## A. Cell-Site Data

*73.* In my training and experience, I have learned that Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

*74.* Based on my training and experience, I know that Service Provider can collect cell-site data on a historical and prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices

32

to which they provide service in their normal course of business to use this information for various business-related purposes.

**B.**     **E-911 Phase II / GPS Location Data**

*75.*     I know that some providers of cellular telephone service, including Service Provider, have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

76.     As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

*77.*     I also know that certain wireless providers, such as Service Provider, can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

33

78.     Based on my training and experience, I know that Service Provider also can collect per-call measurement data, which Service Provider also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

79.     Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

### C.     Pen-Trap Data

*80.*     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

### D.     Subscriber Information

*81.*     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.

## AUTHORIZATION REQUEST

82.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

83.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

84.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the locations of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

35

85.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

**ATTACHMENT A**
**Property to Be Searched**
**Matter Number 2023R109**

1.      This warrant authorizes the use of the electronic investigative technique described in Attachment B to identify the location of the cellular device assigned phone number **773-708-4858**, **IMEI 351050542635590**, (referred to herein and in Attachment B as "**Target Cell Phone**"), whose wireless provider is AT&T ("Service Provider"), a wireless telephone service provider 11760 US Highway 1, Ste. 600 North Palm Beach, FL 33408.

2.      Target Cell Phone.

**ATTACHMENT B**
**Particular Things to be Seized**
**Matter Number 2023R109**

I.      **Information to be Disclosed by the Service Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.   The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period from November 1, 2024 to present:

   i.   Names (including subscriber names, usernames, and screen names);

   ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long-distance telephone connection records;

   iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v.   Length of service (including start date) and types of service utilized;

   vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber

38

Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

39

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with

40

such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

**II.** This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

### III.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of possible crimes of possession of distribution and possession with intent to distribute controlled substances,  conspiracy to distribute and possess with the intent to distribute controlled substances, and use of a communications facility to facilitate a drug-trafficking offense, violations of Title 21 United States Code Sections 841(a)(1), 846, and 843(b), have been committed by Duane WILLIAMS (DOB:XX/XX/1998), Anton MATTHEWS (DOB:XX/XX/1996), Lorenzo GOODEN (DOB: XX/XX/1987), Rico L SMITH (XX/XX/1990), Steven P LLOYD (XX/XX/1983) and other known and unknown individuals during the period of January 1, 2023 to present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.